**TLT CONSTRUCTION CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 00–573C.**

United States Court of Federal Claims.

March 31, 2004.

As Corrected April 21, 2004.

---

Patrick J. Sullivan, Heafitz & Sullivan, Boston, Massachusetts, for plaintiff.

Carolyn Jean Craig, United States Department of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

BRADEN, Judge.

This is a typical government contract case where the governing precedent is well established in the United States Court of Appeals for the Federal Circuit.

## RELEVANT FACTS [1]

### A. The Contract At Issue.

This case involves a dispute between TLT Construction Corporation ("TLT") and the Department of the Army Engineer District, Savannah, Georgia ("the Army") arising under a May 1, 1997 contract for construction, maintenance, and repair regarding the Smoke Bomb Hill Barracks Renovation Phase II at Fort Bragg, North Carolina, Contract No. DACA21–97–D–0015 ("the Contract"). See Def.App. at 1.[2]

The Contract was for an indefinite-delivery and indefinite-quantity with one base year and two option years. See Def.App. at 2. The base year ran from May 1, 1997 through April 30, 1998; the first option year ran from May 1, 1998 through April 30, 1999. See Def.App. at 285. On April 17, 1998, the Army exercised the first option year by issuing Modification No. P0004. See Def.App. at 62. The first year option specifically incorporated by reference a standard Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 52.217–9, provision that allowed the Army's Contracting Officer ("CO") to require delivery of certain numbered bid items upon written notice to TLT. See Def. App at 62.

---

1. The relevant facts recited herein were derived from the following portions of the record: Appendix to Defendant's March 8, 2002 Motion for Summary Judgment ("Def.App."); Appendix to Defendant's July 26, 2002 Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Def.Supp.App."). In addition, certain references herein are made to: Plaintiff's September 25, 2000 Complaint ("Compl."); Defendant's March 8, 2002 Motion for Summary Judgment ("Def.Mot.S.J."); Plaintiff's June 26, 2002 Opposition to Defendant's Motion for Summary Judgment ("Pl.Opp."); Plaintiff's June 26, 2002 Response to Defendant's March 8, 2002 Proposed Findings of Uncontroverted Fact ("Pl. Resp."); and Defendant's July 26, 2002 Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Def.Reply").

Because the court has not relied on Plaintiff's Appendix, Defendant's July 26, 2002 Motion to Strike Plaintiff's Appendix is moot.

2. A government contract becomes effective when the written award is mailed to the awardee, without further action by either party. See STEVEN FELDMAN, GOVERNMENT CONTRACT AWARDS, NEGOTIATION AND SEALED BIDDING, § 19:02 (2003).

Thus, the scope of the Contract for both option periods allowed the CO to order any or all of the services and related materials identified within its scope, *i.e.*, Bid Items, numbered 0001–0049. *See* Def.App. at 23–31. The work itemized in Bid Item No. 0001, however, could only be performed in the base year. *See* Def.App. at 3–11, 283. The base year had an estimated value of approximately $32,000,000, of which the Army ordered services and related materials in the amount of $22,891,000. *See* Def.App. at 124. The contract also incorporated by reference another standard FAR provision, 48 C.F.R. § 52.243–4,[3] that permits the CO to order work changes within the general scope of the contract. *See* Def.App. at 68–69.

## B. Landscape Requirements Concerning Grass And Sod.

On March 15, 1997, the Army prepared four contracting drawing documents entitled Landscape Plan–Fort Bragg (Plates L–1 through L–4), *see* Def.App. at 74–77, a document entitled Typical Shrub Planting Plan, Building H–4817 (Plate L–5), *see* Def.App. at 78, and a document entitled Landscape Plant List Details (Plate L–6). *See* Def.App. at 79. These contract drawings specifically were referenced and incorporated in the April 9, 1997 Amendment of Solicitation and Modification of Contract and made part of the May 1, 1997 Contract No. DACA21–97–D–0015. *Id.* at 19, 35 (Invitation Number DACA21–97–B–0023 List of Attachments, including Contract Drawing File No. 721–11–14, Sheets 1 through 60, 62 through 148).

The minutes of a May 8, 1997 Preconstruction Conference further reflects that:

k. It was recommended that the contractor take photographs of existing conditions at the site prior to the start of construction for his protection.

l. The Contractor is not to drive on any grassed area unless absolutely necessary. Any grassed area damaged by contractor operations must immediately be restored to the original condition at the contractor's expense.

Def.App. at 86.

On September 20, 1999, the Army informed TLT that it was not satisfied with scope work done regarding the landscape

3. 48 C.F.R. § 52.243–4 provides:
CHANGES
    (a) The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes—
        (1) In the specifications (including drawings and designs);
        (2) In the method or manner of performance of the work;
        (3) In the Government-furnished facilities, equipment, materials, services, or site; or
        (4) Directing acceleration in the performance of the work.
    (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; provided, that the Contractor gives the Contracting Officer written notice stating (1) the date, circumstances, and source of the order and (2) that the Contractor regards the order as a change order.
    (c) Except as provided in this clause, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.
    (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for an adjustment based on defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.
    (e) The Contractor must assert its right to an adjustment under this clause within 30 days after (1) receipt of a written change order under paragraph (a) of this clause or (2) the furnishing of a written notice under paragraph (b) of this clause, by submitting to the Contracting Officer a written statement describing the general nature and amount of proposal, unless this period is extended by the Government. The statement of proposal for adjustment may be included in the notice under paragraph (b) above.
    (f) No proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract.

plan's requirements and directed TLT to provide sod at "additional areas," other than those noted on Plate L–5. *See* Def.App. at 90 (handwritten note indicates this "additional area" covered approximately 6,800 yards.); *id.* at 91–96. These areas were located within the dashed lines around the buildings on contract drawing Plates L–3 and L–4. *Id.; see also id.* at 76–77. By a letter dated October 7, 1999, TLT indicated it would comply with the Army's directive, but under protest. *Id.* at 97. The additional sod replacement cost TLT approximately $88,914.00. *Id.* at 99–108. On December 6, 1999, TLT submitted a Total Cost Proposal for $88,914.00 as a Request for Equitable Adjustment as a result of the September 20, 1999 directive. *See* Def.App. at 103–05. On that date, TLT also filed a Request for Contracting Officers [sic] Decision regarding those costs. *Id.* at 100–08.

On June 5, 2000, the CO issued a decision denying TLT's claim. *Id.* at 109–15. Specifically, the CO found that TLT's interpretation of Contract Drawing Plate L–1 Note 3 was "incorrect" in that Note 3 intended the contractor to provide sod on all bare areas within the dashed lines, as well as those disturbed by the contractor, "so that they presented an aesthetically acceptable landscape and a finished liveable barracks." *Id.* at 113. In addition, the CO found that TLT should have made a reasonable estimate of the amount of sod required to provide grass on all areas within the dashed lines, including pre-existing bare areas and those that would be disturbed during the course of construction. *Id.* at 113–14. Finally, the CO found that TLT did not clearly identify any specific areas that had become bare or disturbed as a result of construction activities, and, in any event, TLT made no effort to prevent or otherwise control any such activity. *Id.*

### C. Performance Requirements.

The April 30, 1997 Solicitation Award and Offer regarding the Smoke Bomb Hill Barrack's Renovation Project Schedule provided:

**4.** Item 0001 "Base Year—Install Roof and Roof System, Air Handlers, and Replace Windows, Building H–4350, Complete" @ $425,400. *See* Def.App. at 3.

**5.** Item 0002 "Base Year—Install Roof and Roof System, Air Handlers, and Replace Windows,

*For pricing purposes only,* bidder shall assume the following construction durations from NTP [Notice to Proceed]. *Actual construction durations shall be issued with each delivery order* based on the quantity of work in a given delivery order. For bid item 0001, the successful bidder shall provide performance and payment bonds within 72 hours of award.

| | |
|---|---|
| Item 0001 | 60 calendar days [4] |
| Item 0002 | 90 calendar days/ building [5] |
| Renovate Building, Complete | 240 calendar days/ 4 stack building |
| Renovate Building, Complete | 210 calendar days/ 3 stack building |
| Renovate Building, H–5748, Complete | 180 calendar days/[6] 2 stack building |

Def.App. at 3; *see also id.* at 264 (emphasis added).

The Contract specifically included a standard FAR clause emphasizing the importance of the Notice to Proceed:

52.023–4801 COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (FAR 52.211–10)

(EACH DELIVERY ORDER ISSUED PURSUANT TO THIS CONTRACT SHALL BE CONSTRUED AS BEING A NOTICE TO PROCEED.)

The Contractor shall be required to commence work under this contract within 5 calendar days after receipt of each notice to proceed for each delivery order, prosecute said work diligently, *and complete the entire work no later than the completion time specified on the delivery order.* The time stated for completion shall include final clean up of the premises.

Def.App. at 73 (48 C.F.R. § 52.211–10) (emphasis added).

The Contract, however, also included another standard provision, in relevant part, that states:

Buildings H–4654, H–5448, H–5454, and H–4812, Complete." *See* Def.App. at 3.

**6.** Item 0003 "Base Year—Renovation of Building H–5748 Excluding Work Indicated in Items 0003A and 0003B, Complete." *See* Def.App. at 3.

52.023–4703 PERFORMANCE (CESAS–CT) (July 1994)

(a) This is an indefinite-quantity contract ... of items specified ... for a 12–month period with options[.]

(b) Delivery or performance shall be specified in each individual delivery order issued hereunder. *Individual order performance time will be negotiated.*

Def.App. at 70 (emphasis added).

No TLT representative attended an April 2, 1997 Pre–Bid Conference, where the scheduling of delivery orders and priority of Bid Item No. 0001 were discussed. *See* Def. App. at 36–39, 267–68. Prior to submitting its bid, TLT was provided minutes of this conference via Solicitation Amendment No. 0002. *See* Def.App. at 19–61. Those minutes, in relevant part, provide:

3. The project bid schedule was discussed. There are expected to be two task orders in FY97. The first task order would be bid item no. 0001 with the second task order to be bid items 0002 through 0008[.] Notice to proceed will be issued for work to commence, not to purchase materials only.

4. The construction durations were discussed. The criticality of the schedule was emphasized[.]

*Id.* at 36–39 (Appendix A Pre–Bid Conference Minutes), 269. TLT submitted its bid on or before April 23, 1997. *Id.* at 270. The Contract was awarded to TLT on May 1, 1997. *Id.* at 2.

On May 5, 1997, the Army issued Delivery Order No. 0001, which included a Notice for TLT to Proceed regarding Item 0001 (Item 0001 "Base Year—Install Roof and Roof System, Air Handlers, and Replace Windows, Building H–4350, Complete") in the amount of $425,400 and the cost of a bond. *Id.* at 63, 80, 87, 276. The Notice to Proceed allowed TLT 94 days to complete Bid Item 0001, 34 days more than was estimated by TLT's bid.[7] *See* Def.App. at 3, 80, 276. On May 8, 1997, a Pre–Construction Conference was scheduled to "orient [TLT] with respect to

contract requirements, [Army] Corp of Engineers' policies and procedures, post regulations, safety and quality control programs, and EEO and minority requirements." *Id.* at 80. At this conference, the "Contract Duration" of Delivery Order No. 0001 was discussed and the Notice to Proceed was provided indicating a contract completion date of August 8, 1997 (*i.e.*, 90 calendar days from the Notice to Proceed). *See* Def.App. at 80, 87, 276. The minutes, however, reflect that:

[TLT] provided a schedule which showed the work being completed in 32 weeks and were prepared to negotiate a time for completion. However, the Delivery Orders (DO) are issued with durations and this was reviewed as discussed with the contractor. The contractor is to proceed with DO # 1, but requested that future durations be negotiated.

Def.App. at 86.

In a letter dated May 12, 1997, TLT confirmed its commitment to completion of Bid Item No. 001 Building 4350 by the August 8, 1997 deadline, but indicated that TLT might incur "acceleration costs" since there had been no negotiation of the delivery order's duration. *See* Def.App. at 131. The CO responded in a letter dated May 22, 1997, reminding TLT that the 94 days authorized by the Notice to Proceed was 50% longer than TLT's bid of 60 days. *See* Def.App. at 132–33. The CO reminded TLT that the Notice to Proceed for Delivery Order No. 0001 was also discussed at the April 2, 1997 Pre–Bid Conference. *Id.* at 132. The CO further noted that the total duration of each delivery order is what was to be negotiated, not the duration of each individual item. *Id.* at 133. Since the first delivery order was established for only Bid Item No. 0001, for a single building, negotiating the order's total duration was not necessary. *Id.* The Government maintains that the standard FAR Performance Provision, 48 C.F.R. § 52.023–4703, incorporated into the Contract by reference, was applicable only to the award of multiple buildings in a delivery order. *Id.* at 307.

---

7. The original duration for Bid Item No. 0001 specified in the award was 60 days from date of award. *See* Def.App. at 3.

Under those circumstances, negotiation would address the extent of construction overlap or concurrent construction and the availability of individual buildings from the start of construction. *Id.* at 307.

TLT completed all work on building H–4350 by the August 8, 1997 deadline. *Id.* at 402–03. TLT submitted a formal claim to the CO on November 30, 1998, seeking $263,126.00 for acceleration costs allegedly incurred as a result of the Army's failure to negotiate the performance time for Delivery Order No. 0001. *Id.* at 134–42. TLT alleged that the Notice to Proceed provided to TLT at the April 2, 1997 pre-construction conference denied TLT its contractual right to negotiate the duration for that delivery order, including anticipated weather delays, mobilization time, and an opportunity to competitively seek subcontractors and vendors. *Id.* at 136.

## PROCEDURAL BACKGROUND

On June 5, 2000, the CO issued a decision denying TLT's claim for $88,914.00 incurred as a result of the Army's September 29, 1999 directive that TLT provide sod at "additional areas." *See* Def.App. at 109–15; *see also id.* at 90. The CO did not issue a final decision on TLT's Acceleration Claim. *See* Compl. at ¶¶ 13–16. On September 25, 2000, TLT filed a complaint for breach of contract in the United States Court of Federal Claims. The complaint included: Count 1: the "Sod Claim;" Count 2: the "Bond Claim;" and Count 3: the "Acceleration Claim." *See* Compl. ¶¶ 4–17.

On March 8, 2002, defendant ("the Government") filed a motion for summary judgment regarding all counts. *See* Def. Mot. S.J. at 1. In addition, the Government filed an appendix consisting of 422 pages of exhibits. *See* Def.App. at 1–422. On June 26, 2002, TLT filed an Opposition, in which it advised the court that the parties reached an accommodation and the Bond Claim is no longer at issue. *See* Pl. Opp. at 2; *see also supra* note 1. In its Opposition, TLT asked the court to enter summary judgment "against the moving party" on the Sod Claim. *See* Pl. Opp. at 4. "If our analysis reveals that there are no genuine issues of material fact, but that the

law is on the side of the non-moving party, we may grant summary judgment in favor of the non-moving party even though it has made no formal cross-motion." *Orix Credit Alliance v. Steven C. Horten, et al.,* 965 F.Supp. 481, 484 (S.D.N.Y.1997).

On August 15, 2003, the Honorable Lynn Bush assigned this case to the undersigned judge.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims is authorized under the Tucker Act, 28 U.S.C. § 1491(a)(1), to render judgment and money damages on any claim against the United States based on the United States Constitution, an Act of Congress, a regulation of an executive department, or an express or implied contract with the United States. *See United States v. Testan,* 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The United States Supreme Court, however, has clarified that the Tucker Act does not create any substantive right for monetary damages. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Instead, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages for the court to have jurisdiction. *See Khan v. United States,* 201 F.3d 1375, 1377 (Fed.Cir.2000).

Under the Contract Disputes Act, 41 U.S.C. § 601, *et seq.,* ("CDA"), the United States Court of Federal Claims also has jurisdiction to hear a breach of contract claim, however, a contractor must exhaust available administrative remedies by first seeking and obtaining a formal decision of the relevant CO. *See* 41 U.S.C. § 605(a). In this case, TLT filed timely claims with the Army CO, which issued a decision regarding the sod claims, but declined to issue a decision regarding the acceleration claim. *See* Compl. at ¶¶ 13–16. Therefore, the court now properly has jurisdiction because "[a]ny failure by the [CO] to issue a decision on a contract claim within the period required will be

deemed to be a decision by the [CO] denying the claim and will authorize the commencement of ... suit on the claim as otherwise provided in this chapter." 41 U.S.C. § 605(c)(5).

## B. Standard For Decision.

### 1. Review Of The Contracting Officer's Decision.

The CO's decision, although a prerequisite for the court's exercise of jurisdiction, nevertheless is entitled to no deference, and the contractor retains the burden of proof as to liability, causation, and injury. As the United States Court of Appeals for the Federal Circuit held in *Wilner v. United States*, 24 F.3d 1397 (Fed.Cir.1994):

> As far as the contracting officer's decision is concerned, the CDA states that "[s]pecific findings of fact are not required, but, if made, shall not be binding in any subsequent proceeding." ... The CDA further provides that, after a contracting officer renders a decision upon a claim, a contractor may bring an action directly on the claim in the Court of Federal Claims. 41 U.S.C. § 609(a)(1). In the Court of Federal Claims, the action proceeds *"de novo* in accordance with the rules of the ... court." 41 U.S.C. § 609(a)(3).

*Id.* at 1401.

The plain language of the CDA and our appellate court's decision in *Assurance Co. v. United States*, 813 F.2d 1202, 1205 (Fed.Cir. 1987) make it clear that when suit is brought following a contracting officer's decision, the findings of fact in that decision are not binding upon the parties and are not entitled to deference. The contractor has the burden of proving the fundamental facts of liability and damages *de novo. Id.*

### 2. Summary Judgment.

If there is no genuine issue as to any material fact, the moving party is entitled to summary judgment as a matter of law. *See* CFCR 56(c); *see also Winstar Corp. v. United States*, 64 F.3d 1531, 1539 (Fed.Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

A material fact is one that might significantly affect the outcome of the suit under applicable law. *See Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.... That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of *"some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Where the non-moving party only proffers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

The party moving for summary judgment has the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party carries its burden to demonstrate an absence of any genuine issue of material fact, then the burden of proof shifts to the non-moving party to show a genuine factual dispute exists. *See Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). An issue is genuine only if it might prompt a reasonable fact-finder to resolve a factual matter in favor of the non-moving party. *Id.* at 1562–63.

The court is required to resolve any doubts about factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In addition, all presumptions and inferences must be resolved in favor of the non-moving party. *See Jay v. Secretary of Dept. of Health and Human Servs.*, 998 F.2d 979, 982 (Fed.Cir.1993).

The United States Court of Appeals for the Federal Circuit repeatedly has held that:

"Contract interpretation is a question of law generally amenable to summary judgment." *Varilease Tech. Group, Inc. v. United States,* 289 F.3d 795, 798 (Fed.Cir.2002); *see also Scott Timber Co. v. United States,* 333 F.3d 1358, 1366 (Fed.Cir.2003) (stating that courts apply "general rules of contract interpretation in cases where the United States is a party to the contract.").

### C. Disposition Of The Government's March 8, 2002 Motion For Summary Judgment.

The May 1, 1997 Contract contains a standard integration clause that provides:

This award consummates the contract, which consists of (a) the Government's solicitation and your offer, and (b) this contract award. No further contractual documents is [sic] necessary.

Def.App. at 2.

Therefore, as a matter of law, the terms of the contract must be construed based on the language in the governing documents, not parol evidence. *See McAbee Const., Inc. v. United States,* 97 F.3d 1431, 1434 (Fed.Cir. 1996) (holding that where there is a "strong presumption that the contract was ... [a] fully integrated agreement, coupled with the consistency of the evidence surrounding its execution with that presumption ... the agreement was fully integrated."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 216 cmt. e (1981) ("RESTATEMENT") (the existence of an integration clause is "likely to conclude the issue whether the agreement is completely integrated."). Thus, the court is required to interpret the contract by its "plain language." *McAbee Const.,* 97 F.3d at 1435; *see also Scott Timber Co.,* 333 F.3d at 1366 ("the court accords the contract terms their customary and accepted meaning").

### 1. The Government's Motion for Summary Judgment Regarding TLT's "Sod Claim" Is Denied.

■ The dispute over TLT's sod claim centers on the parties' interpretation of the Contract Drawing Plates. Contract Drawing, Plate L–1 Note 3 provides:

All bare earth and all existing grassed areas disturbed by the contractor shall be tilled, graded smooth, amended with superabsorbent crystal and planted with Tifway 2 Bermuda grass.

Def.App. at 74. The limits for sodding, defined in Plate L–1 Note 5, provide:

Dashed lines around each building are to indicate which trees go with which barracks and provide the limits for sodding and painting of transformers and telephone boxes.

*Id.* Plate L–6 Note 3 provides that "[a]ll grassing shall be solid Tifway 2 Bermuda sod." *Id.* at 79.

On September 29, 1999, the CO directed TLT to sod "all areas shown on the drawings [Plates L–1 to L–6] within the dashed lines around all buildings shown. Our interpretation is that according to General Notes, plate L–1, note 3, *all bare earth and all existing grass areas that are disturbed by the contractor* within the dashed lines will be tilled, graded, smooth, amended with super absorbent crystal and planted with tifway 2 Bermuda grass. Note 3 on plate L–6 requires all grassing to be solid tifway 2 Bermuda sod." Def.App. at 96 (emphasis added); *compare with* Def.App. at 90 (Nov. 5, 1999 facsimile entitled "*Additional* Requirements for Contracting Officers [sic] Decision," indicating that the N.C. Area Office—Corps of Engineers determined TLT was required to provide an additional 6,800 yards of sod) (emphasis added). On October 7, 1999, TLT stated it would comply with the CO's directive, albeit under protest. *Id.* at 97.

On December 6, 1999, TLT filed a Request for Contracting Officers [sic] Decision COR–261 Cost resulting from Providing Additional Sod. *See* Def.App. at 99–102. Therein, TLT argued that the phrase:

"All bare earth and all existing grassed areas disturbed by the contractor" ... has only one interpretation that is consistent with the intent of the contract documents. The phrase "disturbed by the contractor" modifies "all bare earth and all existing grass areas." It is a simple compound predicate sentence with the parallel clauses "all bare earth and all existing grass areas" interchangeable in the sentence.

*Id.* at 100. Attached as an exhibit to the December 6, 1999 Request were two certifications attesting to the accuracy of the cost or pricing data concerning the additional sod. *Id.* at 101–02. Neither the Army nor the CO disputed the accuracy of these costs, *i.e.,* $88,914.00. The CO's June 5, 2000 final decision, however, denied TLT's claim. *Id.* at 109–115. In its March 8, 2002 Motion for Summary Judgment the Government argued that TLT's interpretation is unreasonable and/or in the alternative, gives rise to a patent ambiguity, triggering a duty on behalf of TLT to inquire as to the meaning of the phrase before it agreed to the Contract. *See* Def. Mot. S.J. at 23–25. The Government did not, however, dispute the accuracy of the additional costs TLT incurred.

The court finds no ambiguity in Contract Drawing, Plate L–1, Notes 3 and 5, which only required the contractor to landscape with sod those areas disturbed by the contractor. Assuming *arguendo* that this language is considered to be ambiguous, "it is well established that if a [contract] is ambiguous and the contractor follows an interpretation that is reasonable, this interpretation will prevail." *See Interstate Gen. Gov't Contractors, Inc. v. Stone,* 980 F.2d 1433, 1434 (Fed.Cir.1992). The court also finds that TLT's interpretation of the Contract Drawing Plate L–1, Notes 3 and 5 was reasonable. In the alternative, if the Contract Drawing Plate L–1, Notes 3 and 5 language is ambiguous, it is a latent ambiguity that should be construed against the Army as the drafter of the Contract. *See Metric Constructors, Inc. v. National Aeronautics and Space Admin.,* 169 F.3d 747, 751 (Fed.Cir.1999) (the general rule of *contra proferentem* construes an ambiguity against the drafter).

Therefore, the Government's March 8, 2002 Motion for Summary Judgment regarding TLT's "Sod Claim" is denied and TLT is awarded the undisputed amount of $88,914.00, the cost incurred to comply with the CO's September 29, 1999 directive.

**2. The Government's Motion For Summary Judgment Regarding TLT's "Acceleration Claim" Is Granted.**

■ TLT also claims that "acceleration costs" were incurred in the · amount of $263,126.00, as a result of the Army's refusal to comply with the requirements that "Individual order performance time will be negotiated" for Delivery Order No. 0001. *See* Def. App. at 70; *see also id.* at 134–207. TLT asserts that the contract provision, § 52.023–4703, incorporated by reference into the Contract, required the Army to "negotiate" the performance of Delivery Order No. 0001. *See* Pl. Opp. at 13–17. The court finds otherwise. Prominently displayed on the first page of the March 24, 1997 Solicitation Offer and Award at line 11 is the following language:

> The Contractor shall begin performance within 5 calendar days and complete it within * calendar days after receiving notice to proceed. This performance period is mandatory. *See Sec. 00800, 52.023–4801 (FAR 52.211–10).

Def.App. at 1. The performance period "negotiable" block was not checked. *Id.* Therefore, the court interprets the specific reference to FAR 52.211–10, requiring the contractor to commence within five days of the Notice to Proceed, together with the fact that the negotiable block was not checked to supercede and take preference over the subsequent general reference to contract provision § 52.023–4703. *See Air–Sea Forwarders, Inc. v. United States,* 166 F.3d 1170, 1171–72 (Fed.Cir.1999) (holding that "As a general rule of *contract interpretation,* an express reservation indeed dominates a general provision"); *see also Hughes Communications Galaxy, Inc. v. United States,* 998 F.2d 953, 958 (Fed.Cir. 1993) (" 'Where *specific* and general terms in a contract are in conflict, those which relate to a particular matter control over the more general language.' ") (quoting *Hills Materials Co. v. Rice,* 982 F.2d 514, 517 (Fed.Cir.1992)); RESTATEMENT (SECOND) OF CONTRACTS, § 203(c) (1981) (*"specific* terms and exact terms are given greater weight than general language").

■ Finally, TLT's reliance on constructive acceleration as a theory to support a claim for its "acceleration costs" is misplaced. The court's research has not identified any reported case where the United States Court

of Appeals for the Federal Circuit has addressed the requirements to establish "constructive acceleration," although its predecessor, the United States Court of Claims, held in *Norair Eng'g Corp. v. United States*, 229 Ct.Cl. 160, 666 F.2d 546 (1981), that:

> [I]n order to recover for the increased costs of acceleration under a changes clause, plaintiff must establish three things: (1) that any delays giving rise to the order were excusable, (2) that the contractor was ordered to accelerate, and (3) that the contractor in fact accelerated performance and incurred extra costs.

*Id.*, 666 F.2d at 548; *see also Granite Const. Co. v. United States*, 24 Cl.Ct. 735, 754 (1991). TLT did not establish "any delays giving rise to the order were excusable" regarding Delivery Order 0001. *See* Def.App. at 402–03. In fact, TLT completed Delivery Order No. 0001 without delay. *Id.* And, the CO never issued an order that there was an excusable delay.

Therefore, the Government's March 8, 2000 Motion for Summary Judgment regarding TLT's "Acceleration Claim" is granted.

## CONCLUSION

Accordingly, for the aforegoing reasons: the Government's March 8, 2002 Motion for Summary Judgment with respect to TLT's breach of contract claim regarding additional sod requirements set forth in Count I is denied and judgment is to be entered for TLT in the amount of $88,914.00 and; the Government's March 8, 2002 Motion for Summary Judgment with respect to TLT's breach of contract claim regarding certain "acceleration costs" set forth in Count III is granted. TLT is entitled to interest according to law. *See* 41 U.S.C. § 611. Each side shall bear its own costs.

The Clerk of Court is ordered to enter a final judgment consistent with this Memorandum Opinion.

**IT IS SO ORDERED.**